# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Archway Cookies, et al., | ) | |
| | ) | Case No. 08-12323(CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |
| Jeoffrey L. Burtch, | ) | |
| Chapter 7 Trustee, | ) | |
| | ) | Adv. Pro. No. 09-51429 (CSS) |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| Detroit Forming, Inc., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION[1]

**BIFFERATO LLC**  
Ian Connor Bifferato  
Thomas F. Driscoll, III  
Kevin G. Collins  
800 N. King Street, Plaza Level  
Wilmington, DE  19801  
    -and-  
**LEBENBOM & ROTHMAN, P.C.**  
Stuart A. Lebenbom  
2710 Troy  Center Dr., Ste. 450  
Troy, MI  48084  

Counsel for Detroit Forming, Inc.

**COOCH & TAYLOR, P.A.**  
Robert W. Pedigo  
M. Claire McCudden  
The Brandywine Building  
1000 West Street, 10th Floor  
Wilmington, DE  19899  

Counsel for Plaintiff

Dated:  September 1, 2010  
Sontchi, J. _____

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## INTRODUCTION

Before this Court is the defendant Detroit Forming, Inc.'s motion for summary judgment related to the preference action filed by Jeoffrey L. Burtch, Chapter 7 Trustee for Archway Cookies LLC and Mother's Cake & Cookie Co. (collectively, the "Debtors"). The adversary action seeks recovery of preferential transfers made by the Debtors to the defendant pursuant to 11 U.S.C. §§547 and 550. The defendant seeks summary judgment for determination that the preferential transfers, if any, are not avoidable as they were made in the ordinary course of business pursuant to §547(c)(2)(A). For the reasons set forth below, the Court grants the motion for summary judgment.

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. §§157(b)(2)(A) and (O).

## STATEMENT OF FACTS

*A. Nature and Stage of Proceedings*

On October 6, 2008 (the "Petition Date"), Archway Cookies LLC and Mother's Cake & Cookie Co. (collectively, the "Debtors") filed their chapter 11 petitions. On January 9, 2009, the Debtors converted the cases to cases under chapter 7 and Jeoffrey L. Burtch was appointed as the chapter 7 trustee (the "Plaintiff" or "Trustee").

On July 15, 2009, the Trustee commenced the above-captioned adversary proceeding pursuant to 11 U.S.C. §§ 547 and 550 (the "Complaint") against Detroit Forming, Inc. (the "Defendant" or "DFI") seeking to avoid and recover as preferential six (6) transfers totaling $180,648.17.

*B. Background and History Between the Parties*

DFI is a manufacturer of plastic trays to its customers involved in the food industry. Prior to the Petition Date, DFI provided goods to the Debtors for use in the Debtors' businesses.

DFI and the Debtors began their business relationship in October 2006. DFI provided net 20 day payment terms to the Debtors, and such payment terms were stated on each invoice sent by DFI. On April 2, 2007, Peter Martz, DFI's former CFO/Controller, sent a memorandum to the Debtors (referring to a previous letter sent on March 19th) regarding the financial condition of Archway and A&M accounts, expressing concerns that Archway paid many invoices beyond DFI's "20 day net payment terms," and advising Archway that starting April 9, 2007, DFI "will only release product to be shipped if the account is current."

The Debtors continued to order product from DFI through the Petition Date.

The average number of days elapsing between the invoice date and payment was approximately 42 days during the period of October 2006 through July 7, 2008 (the "Historical Period"), ranging from 21 to 177 days. In comparison, the average

3

number of days between the invoice date and the payment date for transfers during the July 8, 2008 through October 6, 2008 (the "Preference Period") was 47 days, ranging from 33 to 64 days.

During the Preference Period, the Debtors made six (6) transfers to DFI totaling $180,646.17 (the "Transfers").[2] The Plaintiff acknowledges that DFI provided unpaid new value to the Debtors in the amount of $111,973.89. As such, the dispute presently before the Court is whether the remaining transfers, in the amount of $68,672.28, were protected by the ordinary course of business defense set forth in §547(c)(2)(A).

In October 2009, DFI filed a motion for summary judgment for determination of whether the remaining transfers were protected by the ordinary course of business defense. Briefing is now complete and this matter is ripe for decision.

---

[2] The following is a complete list of the Transfers:

| Transfer Amount | Transfer Date |
|---|---|
| $18,461.08 | 7/8/08 |
| $20,754.25 | 8/28/08 |
| $26,634.19 | 8/29/08 |
| $31,620.35 | 9/3/08 |
| $38,395.45 | 9/3/08 |
| $44,782.85 | 9/4/08 |

4

## ANALYSIS

*A.  Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure, directs that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[3]

Summary judgment is designed "to avoid trial or extensive discovery if facts are settled and dispute turns on issue of law."[4]  Its purpose is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required."[5]  Furthermore, summary judgment's operative goal is "to isolate and dispose of factually unsupported claims or defenses"[6] in order to avert "full-dress trials in unwinnable cases, thereby freeing courts to utilize scarce judicial resources in more beneficial ways."[7]

When requesting summary judgment, the moving party must "put the ball in play, averring an absence of evidence to support the nonmoving party's case."[8] In order to continue, the burden shifts to the nonmovant to identify "some factual

---

[3]  Fed.R.Civ.P. 56.

[4]  11-56 MOORE'S FEDERAL PRACTICE, § 56.02 (Matthew Bender 3d ed.).

[5]  *Mesnick v. General Electric Co.*, 950 F.2d 816, 822 (1st Cir. 1991), *cert. denied*, 504 U.S. 985 (1992) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).

[6]  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

[7]  *Mesnick*, 950 F.2d at 822.

[8]  *Celotex Corp.*, 477 U.S. at 325.

disagreement sufficient to deflect *brevis* disposition."[9] Not every discrepancy in the proof, however, is enough to forestall a properly supported motion for summary judgment; the "disagreement must relate to some genuine issue of material fact."[10] In other words, the summary judgment standard "provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."[11]

In order to demonstrate the existence of a genuine issue of material fact in a jury trial, the nonmovant must supply sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant.[12] The same principles apply in a bench trial where the judge is the ultimate trier of fact; the nonmovant must obviate an adequate showing to the judge to find for the nonmovant.[13] At the summary judgment stage, the court does not "weigh the evidence and determine the truth of the matter;" rather, the court determines "whether there is a genuine issue for trial."[14] A material fact is one

---

[9] *Mesnick*, 950 F.2d at 822.

[10] *Id*.

[11] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

[12] *United States v. Jamas Day Care Ctr. Corp.*, 152 Fed.Appx. 171, 173 (3d Cir. 2005) (quoting *Olson v. GE Astrospace*, 101 F.3d 947, 950 (3d Cir. 1996) (citing *Coolspring Stone Supply, Inc. v. American States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993))). *See also Mesnick*, 950 F.2d at 822. ("… 'genuine' means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party [and] 'material' means that the fact is one that might affect the outcome of the suit under the governing law").

[13] *Leonard v. General Motors Corp. (In re Headquarters Dodge)*, 13 F.3d 674, 679 (3d Cir. 1993) ("A fact is material if it might affect the outcome of the case, and an issue is genuine if the evidence is such that a reasonable factfinder [sic] could return a verdict in favor of the nonmovant."). *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial").

[14] *Argus Mgmt. Group v. GAB Robins, Inc. (In re CVEO Corp.)*, 327 B.R. 210, 214 (Bankr. D. Del.2005) (quoting *Anderson*, 477 U.S. at 249).

which "could alter the outcome" of the case. It is genuine when it is "triable," that is, when reasonable minds could disagree on the result.[15] Importantly, all reasonable inferences must be drawn in favor of the nonmoving party[16] and any doubt must be read in favor of the nonmovant.[17]

The requirement that the movant supply sufficient evidence carries a significant corollary: the burden of proof is switched to the non-movant who "must present definite, competent evidence to rebut the motion."[18] Such evidence "cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial."[19] Furthermore, evidence that "is merely colorable or is not significantly probative" cannot deter summary judgment.[20] In response, "the non-moving party must adduce more than a mere scintilla of evidence in its favor;"[21] it cannot simply reassert factually unsupported allegations contained in its pleadings.[22] In other words, the non-moving party must do more than "simply show that there is some metaphysical doubt as to the

---

[15] *Id*. at 210 (citing *Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300, 301 (3d Cir. 1995)).

[16] *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004) (citing *Suders v. Easton*, 325 F.3d 432, 435 n. 2 (3d Cir. 2003)). *See also Interim Investors Comm. v. Jacoby*, 90 B.R. 777, 780 (W.D.N.C. 1988), *aff'd*, 914 F.2d 1491 (4th Cir. 1990); *In re Holzinger*, 89 B.R. 529, 530 (Bankr. E.D. Pa.1988); and *In re Pashi*, 88 B.R. 456, 457 (Bankr. N.D. Ga.1988).

[17] *In re Cantin*, 114 B.R. 339, 341 (Bankr. D. Mass.1990); and *In re Dempster*, 59 B.R. 453, 455 (Bankr. M.D. Ga. 1984).

[18] *Id*. *See also Mesnick*, 950 F.2d at 822.

[19] *Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 181 (1st Cir. 1989).

[20] *Id*. *See also Anderson*, 477 U.S. at 249-50.

[21] *Id*. *See also In re CVEO Corp.*, 327 B.R. at 213.

[22] *See, e.g., Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

material facts."[23] Conversely, in a situation where there is a complete failure of proof concerning an essential element of the nonmoving party's case, Rule 56(c) necessarily renders all other facts immaterial and mandates a ruling in favor of the moving party.[24]

*B. Preferential Transfers*

To be avoided as a preferential transfer, a payment must satisfy all of the requirements of § 547(b):

> (1) to or for the benefit of a creditor;
>
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
> (3) made while the debtor was insolvent;
>
> (4) made . . . on or within 90 days before the date of the filing of the petition; . . . and
>
> (5) that enables such creditor to receive more than such creditor would receive if (A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title.[25]

"The trustee or debtor bears the burden of proving each of these elements."[26] Assuming, *arguendo*, that the Trustee met his burden, the Court finds that the payments are not avoidable because they were made in the ordinary course of business, as set forth below.

---

[23] *PTC v. Robert Wholey & Co. (In re Fleming Cos.)*, 2006 Bankr. LEXIS 896 at *3 (Bankr. D. Del. 2006) (citing *Matsushita Elec. Indus. Co.*, 478 US at 1356).

[24] *Celotex Corp.*, 477 U.S. at 317.

[25] 11 U.S.C. § 547(b). *See also Radnor Holdings Corp. v. PPT Consulting, LLC (In re Radnor Holdings Corp.)*, Case No. 06-10894, 2009 Bankr. LEXIS 1815, at *7-8 (Bankr. D. Del. July 9, 2009).

[26] *Id.* at § 547(g). *See also Radnor*, 2009 Bankr. LEXIS 1815, at *8.

*C. Ordinary Course of Business Defense*

Even if a transfer satisfies all the elements of § 547(b), it nevertheless may not be avoided if the opposing party proves that the transfer satisfies one of the exemptions listed in § 547(c).[27] The party contending that the transfer falls under one of the exemptions bears the burden of proving that assertion by a preponderance of the evidence.[28] In the context of a motion for summary judgment, the burden of proof remains with the party asserting the nonavoidability of the transfer; Plaintiff simply needs to point to the absence of such proof to make its case.[29]

DFI asserts that the payments made to DFI are not preference payments because they occurred during the ordinary course of business pursuant to 11 U.S.C. §547(c)(2).[30] Section 547(c)(2)(A) permits a "safe harbor" for a transferee of a preferential payment if "such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee,

---

[27] *Waslow*, 308 B.R. at 701.

[28] 11 U.S.C. § 547(g); *United States Trustee v. First Jersey Sec., Inc. (In re First Jersey Sec., Inc.)*, 180 F.3d 504, 512 (3d Cir. 1999).

[29] *See, e.g., J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1531 (3d Cir. 1990) (*citing Celotex*, 477 U.S. at 323); *Radnor*, 2009 Bankr. LEXIS 1815, at *10-11; *Hassett v. Altai, Inc. (In re CIS Corp.)*, 214 B.R. 108, 119 (Bankr. S.D.N.Y. 1997).

[30] Section 547(c)(2) states as follows:

> (c) The trustee may not avoid under this section a transfer--
>
> (2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was--
>
> (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
>
> (B) made according to ordinary business terms;

11 U.S.C. § 547(c)(2).

and such transfer was -- (A) made in the ordinary course of business or financial affairs of the debtor and the transferee . . . ."[31] Whether payment was made in the ordinary course of business is a subjective inquiry as to the normal payment practices between the parties.[32] Under 11 U.S.C. §547(c)(2), the "ordinary course of business exception" permits a creditor to retain transfers made by a debtor to a creditor during the ninety days before the petition date if: (1) such transfers were made for a debt incurred in the "ordinary course of business" of the parties; and either (2) the transfers were made in the "ordinary course of business" of the parties; or (3) the transfers were made in accordance with "ordinary business terms."[33] In order to successfully demonstrate that the ordinary course of business exception applies, the creditor must prove by a preponderance of the evidence that the transaction between creditor and debtor meets two of the three subparts of § 547(c)(2).[34]

As explained by the Third Circuit Court of Appeals, the ordinary course of business exception is designed to balance the interests of the debtor and creditor.[35] As the Court in *In re Molded Acoustical Products* explained:

> [T]he preference rule aims to ensure that creditors are treated equitably, both by deterring the failing debtor from treating preferentially its most obstreperous or demanding creditors in an effort to stave off a hard ride into bankruptcy,

---

[31] 11 U.S.C. §547(c)(2)(A).

[32] *In re First Jersey*, 180 F.3d at 512; *Committee of Unsecured Creditors v. Brown (In re Cherrydale Farms, Inc.)*, Adv. Pro. No. 99-328, 2001 Bankr. LEXIS 156, at *9 (Bankr. D. Del. 2001).

[33] *First Jersey*, 180 F.3d at 512.

[34] *Miller v. Westfield Steel, Inc. (In re Elrod Holdings Corp.)*, Case No. 06-11164, 426 B.R. 106, 2010 Bankr. LEXIS 890, at *8 (Bankr. D. Del. 2010).

[35] *In re Molded Acoustical Products, Inc.*, 18 F.3d 217, 219 (3d Cir. 1994).

and by discouraging the creditors from racing to dismember the debtor. On the other hand, the ordinary course exception to the preference rule is formulated to induce creditors to continue dealing with a distressed debtor so as to kindle its chances of survival without a costly detour through, or a humbling ending in, the sticky web of bankruptcy.[36]

In addition to balancing, courts must also be sensitive to a debtor's need to maintain constructive relationships with certain creditors. Most importantly, when a debtor-creditor relationship "has been cemented long before the onset of insolvency--up through and including the preference period--we should pause and consider carefully before further impairing a creditor whose confident, consistent, ordinary extension of trade credit has given the straightened debtor a fighting chance of sidestepping bankruptcy and continuing in business."[37]

The parties do not dispute that the first requirement of §547(c) is satisfied. DFI is in the business of producing plastic trays for use in the food industry and the Debtors purchased the plastic trays for use in their business. Their business relationship lasted for over two years. For these reasons, the Court finds that the first prong of §547(c) is satisfied.

As to the second requirement of §547(c), the Court must decide whether the payments made to the Defendant occurred in the ordinary course of business. To make this determination, courts consider factors such as: (1) the length of time the parties engaged in the type of dealing at issue; (2) whether the subject transfers were in

---

[36] *Id.* at 219.

[37] *Id.* at 224-225. *See also Elrod Holdings Corp.*, 426 B.R. 106, 2010 Bankr. LEXIS 890, at *9.

11

an amount more than usually paid; (3) whether the payments at issue were tendered in a manner different from previous payments; (4) whether there appears to have been an unusual action by the debtor or creditor to collect on or pay the debt; and (5) whether the creditor did anything to gain an advantage (such as gain additional security) in light of the debtor's deteriorating financial condition.[38] In the situation where the parties have a founded tradition of prior dealings, the focus is on those dealings; where the parties have a short history of dealings, the creditor is required to fill the "gap" by reference to a more extensive and exacting analysis of industry standards.[39] Late payments do not preclude a finding that the payment occurred during the ordinary course of business; in fact, a pattern of late payments can establish an ordinary course between the parties.[40]

### i. Length of Relationship

The Court must first review the length of the Debtors and the Defendant to determine if their relationship was "of recent origin," as opposed to being "cemented

---

[38] *In re Forklift LP Corp.*, 340 B.R. 735, 738-39 (D. Del. 2006) (*citing In re Parkline Corp.*, 185 B.R. 164, 169 (Bankr. D. N. J. 1994)).

[39] *Morris v. Sampson Travel Agency, Inc. (In re U.S. Interactive, Inc.)*, 321 B.R. 388, 392-93 (Bankr. D. Del. 2005).

[40] *Big Wheel Holding Co., Inc. v. Fed. Wholesale Co. (In re Big Wheel Holding Co.)*, 223 B.R. 669, 674 (Bankr. D. Del. 1998). To the extent the ordinary course of business exception applies, the Court does not need to determine whether the third prong of § 547(c) is satisfied since the amended 2005 Code, as amended in 2005, requires only a showing that a transfer was *either* made in the ordinary course of business or that the transfer existed under ordinary business terms within the industry. Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 § 1501(b), Pub. L. No. 109-8 119 Stat. 23 (*emphasis added*). *See also Elrod Holdings Corp.* 426 B.R. 106, 2010 Bankr. LEXIS 890, at *13-14.

long before the onset of insolvency."[41] "Bankruptcy policy, as evidenced by the very existence of §547(c)(2), is to promote such continuing relationships on level terms, relationships which if encouraged will often held businesses fend off an unwelcome voyage into the labyrinths of a bankruptcy."[42] In this case, the parties' relationship was established over a two-year period and during their relationship there were 117 transactions between the parties.[43] Based on the length of their business relationship and the numerous transactions between the parties, the Court finds that this relationship was of sufficient length to establish an ordinary course of dealing between the parties.

---

[41] *Molded Acoustical*, 18 F.3d at 225. The *Molded Acoustical* Court found that the creditor's 18 month relationship with the debtor was "of a sufficiently long duration that the relationship is entitled to some leeway, meaning that we might approve a not insubstantial departure from the established … industry norm." *Id.* at 227. *Troisio v. E.B. Eddy Forest Prods. Ltd., (In re Global Tissue, L.L.C.)*, 302 B.R. 808, 814 (D. Del. 2003) (affirming the bankruptcy court's holding that the parties' relationship of approximately 15 months was sufficient to establish an ordinary course of dealings); *Fulcrum Direct, Inc. v Associated Footware, Inc. (In re Fulcrum Direct, Inc.)*, Adv. Case. No. 99-251, 2003 Bankr. LEXIS 318 (Bankr. D. Del. Apr. 14, 2003) (finding that a two year relathship an ordinary course of dealings between the parties); *Unsecured Creditors' Comm. v. CBA Indus. (In re Color Tile, Inc.)*, 239 B.R. 872, 875 (Bankr. D. Del. 1999) (finding a relationship that existed for nearly three years was long enough to establish the course of dealings between the parties). *But see Buffalo Molded Plastics, Inc. v. Omega Tool Corp. (In re Buffalo Molded Plastics, Inc.)*, 344 B.R. 394, 405 (Bankr. W.D. Pa. 2006) (holding that the parties relationship was not lengthy enough to establish an ordinary course of dealings as the first transaction between the parties was subject to the preference action); *Morris v. Sampson Travel Agency, Inc. (In re U.S. Interactive, Inc.)*, 321 B.R. 388, 393 (Bankr. D. Del. 2005) (holding that the year-long relationship did "not create the kind of significant relationship of which *Molded Acoustical* speaks".); *Sacred Heart Hosp. v. E.B. O'Reilly Servicing Corp. (In re Sacred Heart Hosp.)*, 200 B.R. 114, 117 (Bankr. E.D. Pa. 1996) (holding that a 16 month relationship was not of sufficient length).

[42] *Molded Acoustical*, 18 F.3d at 225.

[43] The parties' relationship began on October 16, 2006 and continued through the Petition Date (October 6, 2008). The evidence supports that there were 107 payments in the Historical Period and 10 payments in the Preference Period.

### ii. Similarity of Transactions

Second, the Court must compare the transfers in the Historical Period to those in the Preference Period to determine if the transactions were sufficiently similar. There is no evidence that the amounts paid by the Debtor were inconsistent with historical practices between the parties.[44] All payments were made by check both during the Historical Period and in the Preference Period.[45] In determining ordinary course of dealings between parties, "[c]ourts place particular importance on the timing of payment."[46] Courts have found that small deviations in the timing of payments may not be so significant as to defeat the ordinariness of such payments.[47] In contrast, courts have held greater deviations in payment timing sufficiently significant to defeat the ordinariness of such payments.[48]

---

[44] Patterson Dec. at ¶14.

[45] Patterson Dec. at ¶20 and Troisio Dec. at ¶26. *See Fonda Group v. Marcus Travel (In re Fonda Group)*, 108 B.R. 956, 961 (Bankr. D.N.J. 1989) (holding that a payment made by certified check rather than the customary regular check was outside the ordinary course of dealings between the parties).

[46] *Radnor Holdings Corp. v. PPT Consulting, LLC (In re Radnor Holdings Corp.)*, Case No. 06-10894, 2009 Bankr. LEXIS 1815, *14 (Bankr. D. Del. July 9, 2009)

[47] *Id.* at *14-15; *Ice Cream Liquidation, Inc. v. Fabricon Products, Inc. (In re Ice Cream Liquidation, Inc.)*, Adv. Pro. No. 03-3175, 2005 Bankr. LEXIS 704, 2005 WL 976935 (Bankr. D. Conn. 2005) (holding that a five day discrepancy between average days outstanding during the pre-preference period versus during the preference period did not make the payments out of the ordinary course of business); *Huffman v. New Jersey Steel Corp. (In re Valley Steel Corp.)*, 182 B.R. 728 (Bankr. W.D. Va. 1995) (holding that a difference between approximately 54 days pre-preference average days to payment and approximately 67 days preference average days to payment did not make the payments out of the ordinary course of business); *Branch v. Ropes & Gray (In re Bank of New England Corp.)*, 161 B.R. 557 (Bankr. D. Mass. 1993) (holding that a difference between 38.4 days pre-preference average number of days to payment and 54.7 days preference average number of days to payment did not make the payments out of the ordinary course of business).

[48] *See, e.g., Radnor Holdings Corp. v. PPT Consulting, LLC (In re Radnor Holdings Corp.)*, Case No. 06-10894, 2009 Bankr. LEXIS 1815, at *15 (Bankr. D. Del. July 9, 2009) (holding that the average number of days to payment nearly doubled between the historical period and the preference period, which based on the facts of that particular case, made the payments outside the ordinary course of dealings between the

As set forth above, in the case at bar, the parties' course of dealings was established over two years. During the Historical Period, the Debtors made 107 payments to DFI. These historical payments were made between 21 and 177 days after the invoices were issued resulting in an average days-to-pay of 42.3 days.[49] During the Preference Period, the Debtor made 10 payments to DFI, ranging from 41-64 days, with an average of 47.2 days-to-pay. The difference in the average number of days to payment during the Historical Period and the Preference Period is 4.9 days (47.2 days minus 42.3 days). This difference is not material. Furthermore, there is no evidence of differing payment practices between the parties to this dispute, as evidenced by the April 2, 2007 letter.[50]

The Plaintiff asserts that during the Preference Period the Debtors' payment practices differed greatly from the Debtors' historical practices, including holding checks, voiding checks, and preferring certain vendors over other vendors, among other payment practices reflecting the Debtors' distressed financial status.[51] The Plaintiff argues that because they could not use such delay tactics with the Defendant and as §547 was enacted to prevent such favoritism (as well as to prevent undue

---

plaintiff and defendant); *Hunter v. Amerisource Corp. (In re Parkview Hospital)*, 213 B.R. 509, 516 (Bankr. N.D. Ohio 1997), *aff'd*, 181 F.3d 103 (6th Cir. 1999) (holding that payments made 25 days after the average were within the ordinary course of dealings but payments made 50 days after the average were not).

[49] Notably, before the March and April 2007 letter (18 months prior to the Petition Date) informing the Debtor that no further shipments would be made if the Debtor's account was not current, the Debtor made 30 payments to DFI, ranging from 28-127, with an average days-to-pay of 53.3. After the March and April 2007, the Debtors made 77 transfers to DFI, ranging from 21-91 days, with an average of 38 days-to-pay.

[50] *See generally* Paterson Supp. Dec.

[51] *See generally* Trisio Dec.

pressure from claimants) that such payments were outside the ordinary course of the Debtors' payment practices. However, the subjective test reviews the transactions between the debtor and the defendant, not a debtor's transactions with all of its creditors.[52] In the case at hand, the billing practices are consistent both in the Historic Period and the Preference Period.[53]

The Plaintiff also asserts that the Defendant's pressured the Debtors into payment during the Preference Period by requiring payments on past due invoices before shipment of new goods were made, by requiring the Debtors to pay down its outstanding balance during the Preference Period, by informing the Debtors that expedited payment would result in expedited shipment of goods, and by sending the Debtors a list of past due payments. However, the April letter evidences that DFI's terms were enforced by refusal to ship goods until the Debtors' account was current.[54]

---

[52] *See Molded Acoustical*, 18 F.3d at 224-25 (holdings that when a debtor-creditor relationship "has been cemented long before the onset of insolvency – we should pause and consider carefully before further impairing a creditor whose confident, consistent, ordinary extension of trade credit has give the straightened debtor a fighting chance of sidestepping bankruptcy and continuing in business."). *See also Elrod Holdings Corp.*, 2010 Bankr. LEXIS 890, at *9-13 (holding that an alleged "unusual collection activity" did not except the ordinary course of business defense because periodically during the parties 10 year relationship the defendant contacted the debtor to collect unpaid invoices and threatened to withhold shipment); *Camelot Music, Inc. v. MHW Advertising & Public Relations Inc. (In re CM Holdings, Inc.)*, 264 B.R. 141, 154 (Bankr. D. Del. 2000) ("Congressional intent, as expounded in legislative history, suggests that § 547 looks to both debtor and creditor behavior during the preference period as it works to "discourage unusual action by either the debtor or his creditor during debtor's slide into bankruptcy." See H.R. Rep. No. 595, 95th Cong. 1st Sess. 373-74 (1977) reprinted in 1978 U.S.C.C.A.N. at 5787, 6329. Thus, it is not only undue pressure by creditors that might result in a finding that certain prepetition payments constitute impermissible preferential transfers but unacceptable debtor favoritism as well, as manifest in selective preference period payments to designated creditors by troubled debtors.").

[53] Patterson Dec. at ¶16 and Supp. Patterson Dec. at ¶¶1-4.

[54] Patterson Dec. at ¶¶6, 16, and 19; Supp. Patterson Dec. at ¶¶1-4.

The Plaintiff was unable to point to the absence of such proof to refute this evidence.[55] Although by themselves the tactics described by the Trustee appear to be the practices that §547 was created to solve, the Court finds that these practices were consistent with the historical dealings between the Debtors and the Defendant.[56]

### iii. Conclusion

Based on the length of relationship between the Debtors and DFI, the timing of payments, and the historical billing practices, the Court finds that the Transfers were made in the ordinary course of business and are therefore not voidable pursuant to §547(c)(2)(A).

## CONCLUSION

For the foregoing reasons, the Court grants summary judgment by finding that the Transfers are not voidable as they are protected by the ordinary course defense set forth in §547(c)(2)(A).

An order will be issued.

---

[55] *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1531 (3d Cir. 1990) (*citing Celotex*, 477 U.S. at 323); *Radnor*, 2009 Bankr. LEXIS 1815, at *10-11; *Hassett v. Altai, Inc. (In re CIS Corp.)*, 214 B.R. 108, 119 (Bankr. S.D.N.Y. 1997).

[56] Patterson Dec. at ¶16 and Supp. Patterson Dec. at ¶¶1-4.